JESSE NETTERVILLE, Adm'r, etc., vs. L. K. BARBER, Trustee, etc.

1. MARRIED WOMEN: *Contracts thereof.*
A married woman holding separate property under the statue has the capacity to make certain contracts. She has no power to borrow money, but if she does,

and it is applied to any of the purposes about which she can contract, her property is liable therefor to the lender. Courts should not look with suspicion upon the contracts of a married woman. If she has the capacity to make the contract, she, like others, must take the risks of her business transactions. The law will not intervene and relieve from the consequences of her mistakes, misfortunes, or follies.

2. SAME: *Code of 1871, § 1780, construed.*

This section enables a married woman to become a sole trader, and provides that, "when a married woman engages in trade or business as a *feme sole,* she shall be bound by her contracts, made in the course of such trade or business, in the same manner as if she was unmarried." This provision means more than that a married woman may engage in trade in the commercial sense; it means that she may engage in any employment that requires *time, labor, or skill,* and she is bound by any contract made in the course of such employment.

APPEAL from the Chancery Court of *Wilkinson* County.

Hon. J. R. GALTNEY, Chancellor.

The material facts in the case are stated in the opinion of the court.

The action of the court in dismissing the bill is assigned for error.

*T. V. Noland,* for appellants:

The enforcement of the trust deed was enjoined, and the injunction should have been made perpetual: 1st, because the married woman has no legal power to borrow money; 2d, if she borrows money in fact, it devolves upon the party lending it to show that it was expended for such things as a *feme covert* can purchase, and in which she can contract. In this case such was not the fact, and defendant failed to show it. Cited Code of 1871, § 1780; 42 Miss., 732.

*Van Eaton & Burley,* for appellees:

The proof establishes beyond a doubt that the money borrowed was paid out for the use of Mrs. Netterville's separate property, and for plantation and family supplies, within the provisions of the statute. 12 S. & M., 490; Code, 1871, § 1780; Franklin *v.* Beatty, 5 Cush., 347; Bacon *v.* Sessions, 23 Miss., 272; Stone *v.* Montgomery, 6 George, 83. It may be conceded that under our present statute a married woman cannot bind her separate estate for her husband's debts beyond

the income, but when the contract is for the things enumerated in the statute she can bind the *corpus*. 48 Miss., 691 ; Viser *v.* Scruggs, 49 Miss., 705.

SIMRALL, C. J., delivered the opinion of the court.

Kate Netterville, the wife of Jerry Netterville, in her life-time borrowed from Thomas Johns $2,800, and executed a deed in trust, embracing her separate estate, as security for the money. The defense is that the transaction, on account of her coverture, is " *ultra vires.*" Johns alleges that the money was procured by her to pay off a debt due to D. and J. Cohen, and contracted by her for necessaries for her family and to pay a balance due on a steam engine and apparatus for sawing lumber, which machinery was set up on her lands and used by her. He further alleges that the money was actually so used. The interpretation placed upon the married woman's law of 1857, continued with enlargements in the Revised Code of 1871, has been that a *feme covert* owning and holding a separate estate under the statutes, to the extent that her disabilities have been removed, is a *feme sole*, and that she is clothed with legal capacity to incur liabilities, enforceable out of her property. Freedom from disability is not complete. She is not able to make every sort of contract. But within the limits of the stat-utory emancipation her power to incur debt is unrestricted. The consideration or inducement which supports the debt is the test provided by the statute to determine its validity. That is to be found in § 1780 of the present Code. The statute does not authorize a married woman to borrow money ; nevertheless, if she uses the money to pay existing debts which were of legal obligation, " or for buildings on her land or premises, and materials therefor, or for work and labor done for the use and benefit or improvement of her separate estate," or other legitimate purposes, her property is liable to the lender—liable because of the meritorious employment of the money. But the lender must show that the money was expended for such purposes. Viser *v.* Scruggs,

49 Miss., 709.    Part of the money borrowed by Mrs. Netter-
ville was laid out in the purchase of a steam engine and other
apparatus for sawing lumber, which were erected on her lands.
It was in proof that a portion of her land was a pine forest, of
little value except for the lumber.    It has been pressed in argu-
ment that the adventure in which Mrs. Netterville embarked
was precarious, and, therefore, that sort of structures and
improvements and use of her property is not within the intend-
ment of the statute.

The validity of the debt and the security are placed upon
two clauses of § 1780 of the Code of 1871.    The first is,
and " when a married woman engages in trade or business as
a *feme sole*, she shall be bound by her contracts, made in the
course of such trade or business, in the same manner as if she
was unmarried."    The wife may engage in "trade."    The
original is, perhaps, the custom of London, which allowed a
married woman " on her sole account to be charged as a *feme
sole* concerning everything that touches the craft in which she
is engaged."    2 Bright's Hus. & Wife.    This custom did
not take root in any of the American states, and become a
part of the unwritten law, except South Carolina, where it
extended no further than to buying and selling goods as a
trader, and keeping a boarding-house.    She could not become
a common carrier.    McDaniel *v.* Cornwell, 1 Hill (S. C.),
428 ; Dial *v.* Newper, 3 Rich., 78.    But the statute plainly
meant more than that a married woman may engage in buying
and selling merchandise, or be a trader in the commercial
sense.    The words are, " engage in trade or business."    The
primary signification of the latter word is employment—
" that which employs time, attention, and labor."    The idea
is that a married woman may engage in trade in the com-
mercial sense, and in other employments which require time,
labor, and skill, and shall be bound by her contracts made in
the course of such business.    When the statute retains to the
wife her property, real and personal, and secures to her exclu-
sively the rents, issues, and profits, it intends she shall, like

any other proprietor, so deal with it as to make profit. She may "rent her lands or make any contract for the use thereof." She may "engage for buildings thereon, materials therefor, or for work or labor, or improvement of the same." If her farm is devoted to agriculture, she may clear off the forests, erect a gin-house, and attach to it the necessary machinery. If she prefers steam-power, there is no reason why she may not contract for it. If stone or coal is imbedded, why may she not work a quarry or mine, and put the product on the market? So, if her forests abound in trees suitable for lumber, why may she not convert them into material to erect buildings and fences on her land, or, if she esteem it profitable, go into the lumber business? If she concludes that it will be cheaper to saw lumber for the improvement of her property than to buy it, does the law deny to her the discretion of choice?

If her lands are chiefly valuable because they contain pine or cypress growth, all concede she may make profit by the sale of the trees. Why may she not convert them into lumber, and in that mode make, perhaps, greater profit? With us the cultivation of agricultural products has been almost exclusively the use to which lands have been put—so much so that it is a little difficult to realize that profit may in other modes be got out of them.

If a married woman owns lands chiefly valuable because of the timber, her power to convert the timber into lumber stands upon the same reason that her power to buy mules, grain, hire labor, put up houses and machinery, to produce crops and prepare them for market. In either case she puts the property to that use to which, in her judgment, it is most susceptible and of most profit. For the same reason she would be competent to mine coals or quarry rock, if she owned lands that contained them. The tendency of legislation, guided by the lessons of experience and enlightened reason, is to a larger freedom from the common law disabilities of coverture.

Our narrow statute of 1839 was the first American statute on the subject. That was greatly extended in 1846, again in 1857, and still further in 1871. On every occasion that the legislature has returned to the subject the capacity of the wife has been increased. The principle which underlies these enactments is that the married woman, for certain purposes and within certain limits, shall be emancipated from disabilities. She is conceded to have a judgment and discretion necessary to the discreet use of her power over her property. There is nothing in the statutes which gives support to the idea that the courts must look with suspicion on her contracts, and exercise a sort of guardianship over her transactions. In determining the question of liability the primary inquiry is: Has she capacity to incur it? Is it a matter or subject about which she may incur an obligation? If that shall be answered in the affirmative, the court is in possession of every element to judge of the contract as if made by any other person.

When the legal capacity exists the contract stands upon the same footing as if she was unmarried. If she bargains with a mechanic to build a dwelling-house, she will not be heard to object to the debt because of her imprudence or folly in causing the erection of too expensive a house; if she elects to put in it costly furniture, she must pay for it; if she spread her table with rich viands, and dresses her children in expensive fabrics, and indulges in a fine equipage, it is no plea to say that these things are beyond her means. If she undertakes the cultivation of her lands she must, at her own risk, determine the scale of the expenditure, and cannot escape or reduce her obligations for the supplies on the allegation that they were extravagant. If she conclude that it is to her interest to convert pine trees into lumber to improve her plantation, she cannot escape payment for the machinery because it might have been cheaper to buy lumber elsewhere, or not to make the improvements at all. The capacity conceded, a married woman, like other persons, must take the chances and risks of

her business transactions. The law will not intervene and relieve from all consequences of their mistakes, misfortunes, or follies. It is shown in evidence that the money borrowed from Johns was expended by Mrs. Netterville in paying for and erecting the engine and saw-mill on her land, and in discharging a valid debt to D. and J. Cohen.

The decree is affirmed.